**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**TAMARA ARMSTEAD o/b/o Victor Villanueva,**

         **Plaintiff,**

       **v.**

**MICHAEL J. ASTRUE**, Commissioner of Social
Security Administration,[1]

         **Defendant.**
_____

**1:04-CV-503**
**(NAM/RFT)**

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| Empire Justice Center | Louise Marie Tarantino, Esq. |
| 119 Washington Avenue, 2nd Floor | |
| Albany, New York 12210 | |
| _Attorney for Plaintiff_ | |
| Glenn T. Suddaby | William H. Pease, |
| United States Attorney for the | Assistant United States Attorney |
| Northern District of New York | |
| P.O. Box 7198 | |
| 100 South Clinton Street | |
| Syracuse, New York 13261-7198 | |
| and | |
| Office of General Counsel | Barbara L. Spivak |
| Social Security Administration | Chief Counsel, Region II |
| 26 Federal Plaza | |
| New York, New York 10278 | Arthur Swerdloff |
| _Attorneys for Defendant_ | Assistant Regional Counsel |

**Norman A. Mordue, Chief U. S. District Judge**

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

_____

[1]  Michael J. Astrue became Commissioner of Social Security on February 12, 2007.  Pursuant to Federal Rule of Civil
Procedure 25(d)(1), Michael J. Astrue is substituted as the Defendant in this suit.

In this action, plaintiff Tamara Armstead, on behalf of her minor son, Victor, moves, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), for a review of a decision by the Commissioner of Social Security denying Victor's application for childhood disability benefits.  Based upon the following discussion, this Court finds that the Commissioner's decision denying Social Security benefits must be reversed and remanded for further proceedings.

## II.    BACKGROUND

Victor was born on July 22, 1992, and was twelve years old at the time this action was filed.  Victor has been diagnosed with Tourette's Syndrome, Borderline Intellectual Functioning, speech and language delays, Obsessive Compulsive Disorder (OCD), Oppositional Defiant Disorder (ODD), and Attention Deficit Hyperactivity Disorder (ADHD).

### A.    Medical Evidence

#### 1.    Dr. Theodore Talma, Pediatrician

Victor saw Dr. Theodore Talma on November 13, 2000 for a physical.  T. 118. According to the pediatric case record, Victor's parent[2] reported that he was not doing well in school, had bad behavior, and did not get along well with children of his age.  T. 118.  The record also indicates that Victor received bicycle safety advice at that visit, and that Victor's parent had concerns regarding Victor's "hopping spells" and poor progression at school.  *Id*.  Dr. Talma noted that Victor was "not hyper in office" and that the "plan" was to await a psychology report, "? starting Ritalin" and "continue with counseling".  T. 119.

On March 5, 2001, Victor went "to speak to Dr. Talma about personal issues".  T. 120. The progress notes indicate that Victor had been suspended three times during the school year, "twice for fighting and most recent for having a knife".  *Id*.  Dr. Talma wrote that Victor had

---

[2]  There is no indication whether the report was from Victor's mother or father.

"stolen knife from Kmart". *Id*. Dr. Talma stated that "ADHD should be considered although ODD was a problem in the past and problems seemed to increase". T. 120. Dr. Talma also wrote "? Ritalin trial as well". T. 121.

In a letter dated March 23, 2001, to Jennifer Willwerth, Victor's social worker, Dr. Talma wrote that he reassessed Victor on March 5, 2001, noted that he "appeared to he having a difficult time at school" and "[i]n view of these developments" had referred him to Dr. Salamone. T. 122. Dr. Talma further wrote that Victor "did not seem Hyper in the office. I viewed a video of him on March 23, 2001 which did however seem to support a diagnosis of Tourette's." *Id*.

On March 30, 2001, Dr. Talma noted that "Dr. Salamone wanted patient started on Risperdal . . . for Tourettes", and on April 25, 2001, noted that the Risperdal dosage had been increased. T. 121.

Victor saw Dr. Talma on August 13, 2001, for a physical. T. 169. According to the pediatric case record from that appointment, Victor's parent reported that he was doing well in school, had some "bad behavior", but got "along with children on his . . . age" and had chores to do at home. *Id*. Dr. Talma noted that Victor was seeing Dr. Salamone monthly, his Tourette's and behavior were improving, and he was focusing better on work. *Id*. Dr. Talma also noted that Victor was "not hyper in office". T. 170

### 2.    Frank J. Salamone, Psy.D.

In a letter dated March 28, 2001, Frank Salamone, a psychologist, certified that he was seeing Victor for ongoing treatment and that Victor had been diagnosed with Tourette's Syndrome, which, Dr. Salamone stated, "often has numerous neurobehavioral associated symptoms such as difficulty with impulse control, emotional regulation and inattentiveness." T. 100. Additionally, Dr. Salamone opined that the psychological testing the school conducted

suggested that Victor "is in the borderline mental retardation range of intellectual functioning." *Id.* Dr. Salamone also indicted that Victor, "[b]y everyone's admission . . . is not learning basic skills in his regular education classes" and recommended that Victor be identified as "Other Health Impaired" and "placed in a skills development class." *Id.* Dr. Salamone explained that this "would allow better monitoring of his interactions with other children, as well as more complete attention to his considerable learning problems." *Id.*

Dr. Salamone completed a disability assessment dated "received 9/28/01" which indicated that the date of last exam was August 13, 2001. T. 142. Dr. Salamone stated that he had treated Victor monthly since March 26, 2001. *Id.* Dr. Salamone reported that Victor's fine and gross motor skills and sensory abilities were age appropriate. *Id.* Dr. Salamone opined that Victor's communication, cognitive, social and emotional skills were not age appropriate however, explaining that "IQ testing suggests generally intellec [sic] functioning around 3rd percentile" "[d]elay 3 to 4 years". T. 143. With regard to Victor's social and emotional skills, Dr. Salamone wrote that he had "problems with self regulation". *Id.*

Dr. Salamone described Victor's presenting problem as Tourette's Syndrome based on videotape that Victor's mother brought showing "full complex tics". T. 144. Dr. Salamone stated that Victor was a "[p]leasant child with communication skills like that of 5-6 yr old. No evidence of mood disorder, no psychosis." T. 144. Dr. Salamone noted that Victor was taking Risperidone and was tolerating it well. *Id.* Regarding Victor's mental status, specifically, his attitude, appearance, and behavior, Dr. Salamone indicated that Victor was "cooperative, well groomed and behaved in office setting". T. 145. Dr. Salamone found no evidence of abnormality in Victor's speech, thought or perception. *Id.* Next to "attention and concentration" there is a

downward facing arrow, and Dr. Salamone indicated that Victor's memory was "intact", information was "low", and insight and judgment were "limited".  *Id*.

Regarding Victor's ability to care for himself, Dr. Salamone wrote: "Delayed ability to get self ready for school, do homework independently an[d] be left alone with sibling . . . [d]ifficulties with behavioral regulation".  T. 146.  Finally, Dr. Salamone noted that medicine has helped Victor's tics.  *Id*.

### 3. Dr. Annette Payne, Ph.D.

On September 12, 2001, Annette Payne, Ph.D., conducted a psychiatric evaluation at the Commissioner's request.  T. 139-41.  Dr. Payne noted that Victor's mother reported that he "has had severe behavior problems at home and at school" and that he has "difficulties losing his temper, actively defying or refusing to comply with requests, aggression, and deliberate destructiveness."  T. 138.  Plaintiff also reported that Victor "deliberately annoys others and often argues and talks back . . . is a disruptive influence . . . has difficulties sustaining the attention, and difficulty following through tasks, and being disorganized and distracted."  T. 138-39.  Dr. Payne noted that, according to plaintiff, Victor "fidgets and squirms . . . has difficulties with impulsivity" and that although he had problems with OCD in the past, "this appears to have resolved." *Id*.

Dr. Payne conducted a mental status examination and found that Victor was cooperative and his social skills were "fair."  *Id*.  Dr. Payne stated that Victor's speech "was fluent and clear. There were no articulation difficulties.  His overall intelligibility was good.  His expressive and receptive language skills were adequate."  *Id*.  Dr. Payne found that "[h]is thought processes were coherent and goal directed with no evidence of hallucinations, delusions, or paranoia."  *Id*. According to Dr. Payne, Victor's affect and mood were "agitated" but his sensorium was clear.

*Id*.  Dr. Payne stated that Victor's "attention and concentration were impaired.  He had difficulties with simple calculations."  *Id*.  Additionally, Dr. Payne concluded that Victor's recent and remote memory skills were impaired, that his cognitive functioning was "in the borderline range", and that his insight and judgment were "fair".  *Id*.

Regarding Victor's "Mode of Living", Dr. Payne wrote that according plaintiff, Victor is "capable of his own self-care but needs frequent reminders and supervision . . . he will help with chores around the house with supervision and structure."  T. 140.  Dr. Payne indicated that plaintiff stated that Victor "has difficulties making friends and maintaining friendships . . . fights a lot with his brother" but has a good relationship with his sister.  *Id*.

Dr. Payne opined in her "Medical Source Statement" that "Victor would have difficulties attending to, following, and understanding age-appropriate directions", completing age-appropriate tasks, maintaining appropriate social behavior, "responding appropriately to changes in the environment", and "learning in accordance to cognitive functioning."  T. 141.

### 4.    Consultant Joseph P. Dambrocia, Ph.D.

On October 11, 2001, consultant Joseph P. Dambrocia, Ph.D., completed a Childhood Disability Evaluation Form.[3]  T. 148-53.  Dambrocia found that Victor had a "less than marked" limitation in acquiring and using information, explaining that Victor was in the borderline range of intellectual functioning, had "continued difficulties in math", was in the "low average range of reading and average range in spelling", and had a "spoken Language Quotient in the Average range".  T. 150.

Dambrocia opined that Victor had a marked limitation in attending and completing tasks based on his need for frequent redirection, difficulties in transitions and understanding.  *Id*.

---

[3] There is no evidence that Dambrocia examined Victor.

Dambrocia further noted the school evaluations which indicated Victor's difficulties in distractibility and attention, as well as other documentation which indicated that Victor had impaired attention, concentration, memory, and insight and judgment. *Id*. Dambrocia found Victor had a less than marked limitation in interacting and relating with others, explaining "Mother's report indicates aggressive behaviors, along with making friends and frequent poor interactions with peers, but teacher reports improvements in behaviors following introduction of special services." *Id*. Dambrocia opined that Victor had no limitations in moving about, manipulating objects, or with regard to his health and physical well-being. T. 151. Dambrocia found that Victor had a less than marked limitation in caring for himself, explaining:

> The teacher reports that, while episodes of frustration tolerance difficulties were rare initially, the frequencies had increased as work has became [sic] more challenging, as had behavioral incidents throughout the school day. However, teacher notes that since attending special services his behavior is fine again, and CSW notes progress and plans on moving to a group setting. The claimant attends outpatient treatment only monthly due to success of the intervention, and, while mother reported risk-taking behaviors, recent ROC with mother reports that the initiation of Risperdal has helped significantly.

*Id*. Dambrocia also noted that "Psy P reports difficulties w/ behavioral regulation". *Id*.

### 5.    Psychiatrist Christopher Burky, M.D.

On December 5, 2003, Dr. Christopher Burky, a Child and Adolescent Psychiatrist, evaluated Victor to assess "Attention Deficit Hyperactivity Disorder symptoms and possibly other need for medication". T. 369-73. Dr. Burky recounted the history of Victor's present illness, past diagnoses, social and developmental history, past medical history, and family psychiatric history. T. 369-71. Dr. Burky stated that upon mental status examination, Victor was cooperative, "maintained fair to poor eye contact" and had "soft but intelligible speech" which was normal in its "rate, rhythm, and shows no evidence of verbal tics." T. 371. Dr. Burky described Victor's

affect as "appropriate", and reported that his "thought processes and thought contact are logical and goal-directed". *Id*. Dr. Burky stated that Victor was "oriented to time, place, and person" and that his "recent and remote memory" were intact. *Id*. According to Dr. Burky, Victor's "concentration and on [sic] are both fair to poor. Victor requires questions to be repeated to him several times." *Id*. Although Dr. Burky opined that Victor's abstract thinking was "age-appropriate", he found that his "judgment and insight are both poor". *Id*.

Dr. Burky noted Victor's prior diagnosis of OCD and Tourette's Syndrome, but was not convinced that he met the diagnosis for Tourette's because Victor's "hopping behaviors, which generated the diagnosis, seemed more accurately fit under a compulsive behavior." *Id*. Dr. Burky diagnosed Victor with Obsessive Compulsive Disorder, Attention Deficit Hyperactivity Disorder, combined type, and Oppositional Defiant Disorder. T. 372. Dr. Burky noted that Victor did not seem to be doing well at school since being placed in a less structured classroom. *Id*. Dr. Burky recommended continued individual therapy, an increase in Victor's Risperdal dosage, that Victor be "given consideration for a trial of medication" for ADHD, and that Victor be "considered for replacement in a more structured setting at school." T. 372-73.

**B.    Academic Records and Evaluations**

A significant portion of the record consists of information about Victor's performance and behavior at school.

**1.    1998 -1999 Academic Year - First Grade**

According to the evidence in the record, on January 6, 1999, Victor, who was in first grade at Elmer Avenue Elementary School, was referred for a Child Study Team ("CST") meeting. T. 203. The meeting minutes state that Victor was in the low reading group, required "1:1 monitoring due to attention and skills, easily distracted", that he could be outspoken and

manipulative, had "very slow progress," and was socially immature although he behaved "well with structure." *Id*. The CST recommended a psychological evaluation. *Id*.

According to a Section 504[4] Accommodation Plan dated April 14, 1999, Victor had "[d]ifficulty with new concepts and retaining information. Requires great support." T. 206. Counseling assessment, aide support in the classroom, "Language arts block", and modifications in classwork were recommended. *Id*.

Victor's discipline records indicate that on February 26, 1999, Victor received lunch detention for an infraction in the cafeteria during lunch. T. 365, 261

### 2. Academic Year 1999-2000 - Second Grade

According to a Section 504 Accommodation Plan dated May 24, 2000, "Victor has a history of high lead levels and possible 'seizure' activity which have appeared to present with significant academic need". T. 181. Further, Victor had "difficulty focusing, retaining information, weak foundation for mathematic skills." *Id*. School faculty in attendance, including Victor's teacher, social worker, principal, nurse, and school psychologist intern, recommended a counseling assessment and development of a behavior plan, "if indicated", and "aide support in classroom - 45 minutes per day". *Id*.

Victor's discipline records indicate that bus disturbance reports were filed on November 8, 1999, November 10, 1999, and December 13, 1999. T. 365. On February 16, 2000, Victor received a one day suspension for "excessive mischief" and "eating-drinking-littering" on the school bus. T. 247.

### 3. Academic Year 2000-2001 - Third Grade

---

[4] This refers to § 504 of the Rehabilitation Act of 1973.

CST meeting notes dated September 27, 2000, recommended an updated psychological evaluation. T. 215. The CST referred Victor for a psycho-educational evaluation because of concerns that he had difficulty in all academic areas and because Victor's mother was concerned "that significant behavioral issues may be impacting his ability to function at school." T. 132.

On October 27, 2000, October 30, 2000, and November 30, 2000, Tonya Chacon, CAS, and Supervising Psychologist Steven Morse, evaluated Victor to assess "current cognitive, academic, and social-emotional functioning." *Id*. The results from the Wechsler Intelligence Scales for Children-Third Edition indicated that Victor fell within the "the mild range of mental retardation to the Borderline Range of cognitive functioning." *Id*. According to the evaluation, "Victor responded well to subtests that required him to use spatial and perceptual organization skills, but he experienced more difficulty when tasks drew upon his understanding of social norms and verbal reasoning skills." *Id*. Additionally, "[t]he Comprehension subtest, which measured social judgment and verbal reasoning, was an area of significant weakness". *Id*.

Regarding academic achievement, and reading in particular, the Wechsler Individualized Achievement Test revealed that Victor ranked in the "Low Average Range" but experienced more difficultly in reading comprehension. *Id*. Victor's mathematics score, which was in the second percentile, revealed minimal academic gains since first grade. *Id*. In writing, Victor had "several challenges". *Id*.

In the area, "Social Emotional Functioning", scores "on the Externalizing Composite", which measured hyperactivity, aggression, and conduct problems, "were in the Clinically Significant Range." T. 134. According to the evaluation, internalizing behaviors, including anxiety, depression, and somatization, were within the "Average Range." T. 134-35.

10

The evaluation included an assessment from plaintiff, Victor's mother, who indicated that "Victor presents with significant aggressive and risk-taking behaviors, which resulted in significant injury (e.g., bruised collarbone, a head injury, and running into a tree). Victor can also become aggressive (e.g., pushing his brother downstairs) at times." T. 135. "Victor's developmental history is significant for high lead levels. . . . Ms. Armstead noted repetitive arm flailing and habitual behaviors such as hand washing, getting his hair cut at specific times, and having his clothes prepared in a particular manner as examples of Victor's ritualistic behaviors." *Id*.

At a CST meeting[5] on November 15, 2000, Chacon, the principal, the school nurse, the social worker, a social work intern, and plaintiff met to discuss the results of Victor's psycho-educational evaluation, including Victor's "borderline" full scale IQ of 73. T. 178. According to the meeting minutes, "[a]t home, Victor needs 1:1 support for homework". *Id*. The minutes also indicated that in the classroom Victor was "very friendly" but needs "1:1 support for any task when frustrated - just stops + 'freezes'". T. 179. The notes stated that at home, Victor was "violent with his brother" and tried to push him down stairs, that he has had "stitches 3x in last year" and that he "likes jumps on his BMX". *Id*. The CST recommended referral to the Committee on Special Education ("CSE"). T. 178.

On December 11, 2000, Victor's third grade teacher referred him to the CSE because he was "[s]everely below grade level in all areas. Retention of any new information is virtually nonexistant. This has been a consistent pattern since K." T. 218. Victor's teacher further stated that "Victor functions on a very low level and requires 1:1 help to accomplish most tasks" and

---

[5] In the administrative record, the top of this page is cut off. T. 178. The form however, is the same as the form on T 203, and that form indicated at the top that it contained "Child Study Team Minutes". T. 203.

that he "gets along well with adults and children at school. He requires much repetition to understand something, but does not remember how to do it the next day." T. 219.

A Special Education Evaluation was issued following examinations by "K. Lancaster" on January 17, 2001, and January 25, 2001. T. 131. The evaluation indicated that Victor's teacher, Ms. Brumbaugh, "had concerns regarding his progress and high level of adult assistance to accomplish all academic tasks." T. 131. As a result, interventions and modifications were implemented, including "Project Lift-Off, 504 Plan, aide support, remedial rdg. and math - push-in, modifications to his homework and preferential seating." *Id*. Results of the Woodcock-Johnson Tests of Achievement indicated that Victor's reading and writing abilities were within the second grade equivalent, and his math abilities were within the first grade equivalent. *Id*.

In a mid-year compensatory reading progress report dated February 2001, Victor's teacher rated his willingness to work at assigned tasks and ability to work independently as "unsatisfactory" and his ability to work cooperatively in a small group as "needs improvement" and "unsatisfactory". T. 222. According to the report, Victor's instructional needs were not being met, Victor was "not highly motivated", and "[e]ven modified third grade curriculum was far above his instructional level". T. 223.

On February 9, 2001 and February 14, 2001, Michele Feiden, a Speech-Language Pathologist, evaluated Victor to assess his current level of speech and language functioning. T. 101- 104. Teachers' "concerns regarding Victor's language processing skills, as well as his academic development" prompted Feiden's evaluation. T. 101. The testing indicated that Victor was within the average range for "the spoken language quotient, organizing, speaking and semantics" but "fell below the average range for listening skills, and syntax." T. 101. The Peabody Picture Vocabulary Test, during which Victor was "shown a template with four pictures

on it, and [was] asked to point to the one verbalized by the examiner" indicated that Victor had a "mild-moderate delay" for receptive vocabulary skills.  T. 102.  The Expressive Vocabulary Test, during which Victor was "shown a picture, told what the picture was, and then asked to give a synonym for that word" indicated a "moderate delay."  *Id*.  Victor performed within the average range during four of the six "subtests" during the Language Processing Test-Revised, but had difficulties with the "Differences subtest" which required him to contrast two items and determine unique traits" and with the "Multiple Meaning subtest" which required him to determine the meaning of a word based on the context within which it was used.  T. 103.  Feiden found that Victor's "[a]rticulation, voice and fluency skills all appeared to be within the average range."  T. 104.  Feiden noted that "[o]verall, Victor was a pleasant child who needed few reminders to stay on task.  He needed extra time to answer questions, and seemed to exhibit some language processing difficulties as the linguistic demands were increased."  *Id*.  Feiden recommended that Victor "be seen for speech improvement services . . . to address his language and vocabulary delays, as well as his language processing difficulties."  *Id*.

In a mid-year compensatory math progress report dated March 2001, Victor's teacher rated his desire to improve, willingness to work at assigned tasks, ability to work independently, and the benefit Victor received from individual assistance as "needs improvement" and "unsatisfactory", explaining that Victor was having a hard time keeping up with the class.  T. 224.

On April 26, 2001, Ms. Brumbaugh, Victor's third grade teacher, completed a performance questionnaire at the Commissioner's request.  T. 125-30.  Brumbaugh stated that Victor exhibited "poor frustration tolerance behaviors such as fighting, tantrums, crying episodes" and explained that these episodes were rare at the beginning of the year, but increased as the work got harder.  T. 126.  Brumbaugh indicated that Victor would "shut down", "refuse to try", "get

into trouble on the bus, before school & during lunch a few times each week", but noted that "attending special services classes has helped him in this area." *Id*. Brumbaugh stated that Victor exhibited occasional "inappropriate social interaction behavior" by withdrawing during class which "had been happening far more frequently." T. 127. According to Brumbaugh, Victor "continues to have significant problems with school work." *Id*. Ms. Brumbaugh further explained that although Victor had excellent behavior and effort at the beginning of the year, "[a]s the work became more challenging and he was unable to succeed, he became frustrated. Soon after that he began having behavior problems, primarily during instructional times of the day. Since he has started to get educational support, his behavior has been fine again." *Id*. Brumbaugh stated that Victor did not demonstrate problems in performing age appropriate self-care, explaining that "[h]e is quite aware of his appearance. I have not seen him engage in any dangerous activities." *Id*. Brumbaugh reported that Victor had problems "in the effective completion of tasks in a timely manner", explaining that "Victor completes approx. 1/10 of a given assignment in the time it takes other students to complete it." T. 128. Brumbaugh stated that while Victor's speech could be heard and understood, he "stumbles and has some difficulty expressing himself without pauses. This frustrates him." Additionally, Ms. Brumbaugh indicated, "[h]e has difficulty expressing himself in orally and in written form." T. 129.

In a report dated May 2, 2001, Jennifer Willwerth, a Clinical Social Worker at Victor's school, stated that she met with Victor six times between February 2001, and April 2001:

> Victor has been a cooperative participant in the early stages of the counseling relationship. He is eager to attend. We are working on developing a basic feeling vocabulary and developing effective problem solving skills. While I am seeing him individually at this time, my recommendation for next year is a group setting.

T. 98.

Willwerth provided a recommendation for the 2001-2002 school year and stated that her goal was for Victor to "use appropriate words and actions to express his needs and feelings, as evidenced by a reduction in off task behaviors". T. 99. For the short term, Willwerth set the following objectives for Victor: "learn a basic feeling vocabulary"; "use words to appropriately express his feelings in counseling sessions, with adult prompt, 75% of the time"; and "engage in an age appropriate, structured group activity, with adult prompt, for a period of 15 minutes". *Id*.

In an end of the year reading report form dated June 2001, Victor's teacher stated that "there has been no growth in reading but slight improvement in lang. skills". T. 227.

Following a meeting on June 21, 2001, the CSE prepared a 2001-2002 Individualized Education Program ("IEP"), which classified Victor as "other health-impairment" and recommended that Victor be placed in Special Education, outside general education, five days per week, that he go to the Resource Room three days per week, and receive social work counseling once per week and speech services twice per week. T. 190-91. The IEP stated:

> Victor is able to successfully complete work when working 1:1 with an adult or in a small group. If Victor meets a similar task though, he frequently does not remember how to do it. He requires a bit of repetition to 'own' something. Victor completes homework nightly with the help of his mother. He is frequently unable to complete classwork in school. Victor tries hard to succeed in reading and writing but he is functioning successfully only on a 1st Grade level. When Victor gets frustrated, he shuts down.

T. 192. The "notes as of 5/25/01" state:

> Victor has been part of special Education Instruction group since the beginning of April, 2001 . . . . He has met with some academic success and has made observable progress in the small group situation (group of 5). He has been able to repeat directions back to teacher so as to remember them himself. Of late he has 'turned on the tape recorder in his head' and successfully completed assignments without asking for repetition of instructions. His motivation to be correct in the group is obvious and he tries very hard to complete all tasks. Math has been a combination of teacher-designed materials at his level (basic math facts) and the Everyday Math tasks (modified to his level). Victor has not 'shut-down' while in the small group because

efforts are made to avoid frustration causing assignments.  When difficulties are encountered, much encouragement is given and 1-1 instruction is used.

*Id*.

Regarding "Social Development", the IEP indicated: "Victor usually gets along with students and adults at school.  When he gets frustrated, 'he shuts down' and refuses to communicate."  *Id*.  The "notes as of 5/25/01" stated: "Victor has shown progress in his abilities to cooperate in a diverse group . . . .  He has become more helpful to others and is able to join in without intense competition than he was when he first joined the group in early April.  He is well liked by the other students."  *Id*.

Regarding "Management Needs", the IEP stated: "Victor is easily disrupted by other students.  His desk has been moved away from other students to help him focus.  Victor requires 1:1 or small group help from an adult to complete most tasks.  Victor often takes up to 15 minutes to get himself ready to attempt a task (i.e. warm-up, assignments, preparing to leave the room, etc.)"  *Id*.  The "notes as of 5/25/01" stated:

> Victor can be distracted by others in the group.  However, this interest in what they are doing has been used as a positive . . . .  Frequent checking on his task progress is used to ensure that Victor doesn't quit working or continue with incorrect procedures. [A]ssignments are given so as to be completed in shortened time spans and gradually time required for completion lengthened as Victor becomes more able to sustain his attention.  Movement around the room is structured so that he does not have to remain in one spot for the full hour.  Tourettes [sic] syndrome behaviors have NOT been observed.  His need to have everything 'just so' (OCD?) have been ignored and allowed so as to make Victor feel more comfortable and give his attention to academic tasks.  Victor is more comfortable with 'time warnings' so that transition times are anticipated.

T. 193.

Victor's discipline records indicate that: on January 16, 2001, Victor received a discipline referral for refusing to follow adult direction, T. 260; on January 25, 2001, Victor received a

suspension for kicking another student, T. 242; on January 31, 2001, Victor received an in-school

suspension for disruptive classroom behavior and refusing to follow adult direction, T. 259; on

February 14, 2001, Victor received an in-school suspension for fighting, T. 258; on March 2 or 3,

2001, Victor received suspension for possessing a pocket knife, T. 244, 365; on March 23, 2001,

Victor received a discipline notice for kicking another student, T. 257; and on March 28, 2001,

Victor received a discipline notice for pushing, shoving, and kicking another student.  T. 256.

### 4.      Academic Year 2001-2002 - Fourth Grade

Willwerth's goal for the 2001-2002 school year was for Victor to "use appropriate words

to express his needs and feelings, as evidenced by a reduction in off task behaviors."  T. 248.

Following a meeting on March 26, 2002, the CSE prepared a 2002-2003 IEP for Victor.

T. 159-64.  The IEP classified Victor as having "other health-impairment" and the CSE

recommended that he be in Special Education programs, specifically a special class outside

general education, and receive social work counseling once per week and speech services twice

per week.  T. 159-60.  Victor's fourth grade teacher stated in the IEP that:

> Victor appears to be very comfortable in my classroom.  He is easily engaged in all
> academic areas and enjoys being challenged in all subjects.  He is an active oral
> reader and has worked very hard to not yell out answers to other students reading
> lessons.  His work is extremely neat and legible.  Assignments are completed in a
> timely fashion and corrections that he has to make are done with little or no problems.
> Mathematics, while still a challenge at this writing, is progressing satisfactorily.  He
> has no problems with addition and subtraction of single digit numbers, can tell time
> to the hour and can measure objects in metrics with slight assistance.  Coin values are
> known most of the time (groups of different coins can be a problem) and he has a
> good grasp of paper money.

T. 161.  Victor's teacher further wrote that:

> Victor is easily distracted, especially during math.  He is also a doodler and he has to
> be closely monitored to make sure he stays on the task I want him to working on.  He
> tends to sulk when I reprimand him for unacceptable behavior.  He gets out of his seat

without permission far too often and, while slight improvement of late is appreciated, he still has more work to do in improving his self-control.

*Id*. Victor's teacher described Victor's social development as follows:

> Victor is a happy student most of the time in my room.  He is much bigger than the other students and has developed into a leader in his peer group.  Thankfully, he is not an aggressive boy as his size would give him a distinct advantage in a physical argument.  He has responded when asked to help out a peer with academics or playing in periods of free time.

*Id*. As far as Victor's management needs, the IEP indicated that:

> Victor is progressing adequately on minimizing time needed to help keep him on academic tasks.  He asks for help when he is confused and is getting much better at following directions in all academic subjects . . . . [H]is main problem is his impulsive behavior, especially when he is at his desk.  Constant requests from me and the staff to raise your hand when you want to leave your seat, go unheeded.  He feels bad when he sets himself up for reprimands from me . . . .  All in all, he is a great kid.  As he matures and his self-confidence grows, I look for the changes I would like to see occur.

T. 161-62.

Discipline records indicate that: on October 30, 2001, Victor received a discipline notice for throwing food, T. 244, 364; on November 1, 2001, Victor received suspension for throwing an orange at other students, and refusing to follow the teacher's instruction to put the hair pick he was "waving . . . like it was a weapon" in his pocket, T. 254, 364; on November 30, 2001, Victor received a discipline notice for refusing to follow direction.  T. 253, 364; on December 3, 2001, Victor received a Bus Conduct Report because he violated safety procedures, was involved in "fighting-pushing-tripping", and used "unacceptable language",  T. 252; on December 6, 2001, Victor received "Time Out" for "Throwing rocks or other objects" after having been warned several times not to throw things, T. 251, 364; on December 11, 2001, Victor received "Time Out" for "obscene language or gestures", T. 250; on December 21, 2001, Victor engaged in a "cafeteria/lunch infraction", T. 364; on January 28, 2002, Victor received a bus conduct report

and suspension  from riding the bus for teasing and harassing another student,  T.  270; and on February 27, 2002 and March 26, 2002, Victor engaged in "persistent refusal to follow adult direction", T. 364, 363.

### 5.    Academic Year 2002-2003 - Fifth Grade

The record contains Daily Behavior Logs from September 2002 through February 2003, in which Victor's teacher rated Victor's behavior in the following areas: "was cooperative", "followed directions the first time", "tried his or her best", "respected all adults, respected classmates", "completed all classwork", and "completed all homework".  T. 274-347.  While Victor's teacher rated his behavior as good or excellent in most areas on most days, the logs from approximately one third of the seventy-three documented days indicate that Victor "needed to work on" one or more of the above-referenced areas.  *Id*.

Victor's Elementary Progress Report dated November 19, 2002, T. 165-67, contained the following comment:

> Victor is a kind and pleasant young man.  At times he is more respectful than others, but he usually is helpful and considerate of adults and his classmates.  Recently I have seen Victor putting more effort and concern into his work.  If he continues with this trend, he will be very successful academically this year.  Please continue to encourage him at home and work with him on issues that may occur with other students.

T. 167.

In an annual review report dated February 24, 2003, Harold Sperazza, a social worker at Victor's school wrote that:

> Victor . . . was enrolled in Lincoln School in 9/02 and entered Mrs. Shephard's self-contained special education classroom.  Victor's adjustment to Lincoln School has been very good.  Behaviorally, he has made good progress in all areas.  While there have been some difficulties in terms of his behavior in less structured areas and periods of the day he has generally shown good improvement in this area. . . .  In all areas Victor has made good progress.  He quickly engaged with his counselor and showed a much improved ability and willingness to express his frustrations and needs

to adults rather than acting out behaviorally.  His peer relationships were very positive throughout year [sic] and conflicts with peers were minimal.

T. 272.

A Notice of Proposed Placement Program sent to Victor's parents following a CSE meeting on February 27, 2003, classified Victor as "other health-impairment" and recommended his placement in a special class of fifteen students and that he meet with a social worker once per week.  T. 352-53.

Victor's disciplinary records indicate that: on December 3, 2002, Victor received a bus conduct report indicating that Victor had engaged in "excessive mischief" on the bus, T. 269, 363; on December 11, 2002, Victor received "Time Out" for obscene language or gestures after making inappropriate comments to another student, T. 249; on December 18, 2002, Victor received a bus conduct report for engaging in "excessive mischief", T. 270; on January 28, 2003, Victor received suspension for a bus disturbance, T. 363; on March 3, 2003, Victor received a bus conduct report  for "fighting-pushing-tripping" on the bus, T. 268, 363; and on March 18, 2003, Victor received a bus conduct report which resulted in a two day suspension, T. 362, 363.

### 6. 2003-2004 Academic Year - Sixth Grade[6]

The record contains an Interim Report for the period ending on October 3, 2003.  T. 368. Victor's teachers indicated that while he was doing well in some areas, showed good effort or improvement, he was often disruptive, unprepared, "easily distracted", and "requires constant supervision".  *Id.*

On November 18, 2003, the Committee on Special Education met to discuss Victor.  T. 366.  Victor's teacher reported that he "makes noises @ times on task, responds to redirection.

---

[6] This evidence, and the remainder of the evidence relating to Victor's academic progress, post-dates the ALJ's decision.  As discussed in section V.A., it is part of the administrative record because it was submitted to and expressly considered by the Appeals Council and for this reason it is set forth above.

Reports of being easily distracted, poor judgment". *Id*. The psychological assessment portion of the meeting notes stated: "Currently OCO, symptoms, impulse control issues consistent w/ADHD". *Id*. The Committee recommended developing a behavior plan. T. 367.

Victor's disciplinary records indicate that: on September 10, 2003, Victor received "pm detention" for, *inter alia*, not paying attention and disobeying classroom rules, and failing to "show for lunch detention", T. 359, 363; on September 19, 2003, Victor received detention for threatening other students, T. 358, 363; on October 2, 2003, Victor received detention for throwing a pencil down the stairs into a crowd of students, T. 357, 363; on October 15, 2003, Victor received detention for throwing an apple at a girl, T. 356, 363; on October 23, 2003, Victor received two lunch detentions for slamming the classroom door, after already receiving lunch detention for disruptive behavior earlier that day, T. 355, 363; and on October 31, 2003, Victor received a five day suspension for pulling a fire alarm, T. 354, 363.

## C.    Administrative Hearing

On March 5, 2003, a hearing was held before the Administrative Law Judge at which Victor and plaintiff testified. T. 374-403. Victor testified that he liked math and reading at school. T. 379-80. Victor stated that he thought he was having problems at school, specifically, fighting with his friend, and "some other kids." T. 380. Victor stated that the fighting happened on the bus and at school. T. 381. Victor testified that he takes medication and that his mother reminds him to take it. T. 382. Victor stated that he has two snakes, a bird, and a dog at home. *Id*. When asked how he got along with his sister and brother, Victor responded that he got along with them "somewhere in between" good and bad. T. 383. Victor stated that he plays video games, plays outside, that he has friends at home with whom he plays tag and "hide 'n seek". T.

384.  Victor stated that he played on a football team and planned to play again the following year.

T. 384-85.  Victor testified that he also likes to play basketball.  T. 385.

Victor stated that his mother gave him jobs to do around the house, like vacuuming,

cleaning his room, and cleaning the table after meals.  T. 386.  Victor also stated that he has to

walk the dog daily.  *Id*.  Victor testified that he "hops" in class.  T. 390.

Plaintiff testified that Victor lives with her and his younger brother and sister.  T. 391.

Plaintiff described Victor's hopping as "arm flailing and jumping at the same time" and stated

that he could do this for five minutes or thirty minutes depending on whether someone stopped

him.  T. 392.

Plaintiff stated that Victor was doing "all right in school" explaining that he "has good

days and bad days, he has a lot of behavior issues, even since he's been in the contained

classroom."  T. 393.  Plaintiff testified that Victor was having "big trouble" on the bus and that he

"got suspended off the bus and got written up on the bus . . . [s]o now I'm picking him up from

school".  *Id*.  Plaintiff stated that she hears from Victor's teacher daily.  *Id*.  Plaintiff testified that

Victor does not get along well with other students, explaining "[u]sually, it's just little things, but

. . . there is always some little problem".  T. 394.

Regarding Victor's ability to focus on an activity, plaintiff testified that it depends what

the activity is and whether it interests him.  T. 395.  Plaintiff stated that Victor does anything to

avoid homework, and that if he becomes frustrated, he gets angry and shuts down.  *Id*.

Plaintiff testified that Victor fights with his younger brother "constantly from morning

until he goes to sleep."  T. 396.  Plaintiff stated that they fight and Victor is "very aggressive."  T.

396.  When the ALJ asked plaintiff how many friends Victor had, she responded "no one comes

around, no one calls".  *Id*.  Plaintiff testified that five or six months earlier, and just over "this past

school vacation", Victor had been playing with another boy "up the street" but now "they are separated" because Victor allegedly "stole their bike".  T. 397.  Plaintiff testified that although Victor played football, he did not understand the rules well.  *Id*.

Plaintiff testified that Victor has a specific morning routine, is "particular about his hair", and that it takes 15 to 20 minutes for her to do his hair.  T. 399.  Plaintiff stated that Victor goes to the barber every two weeks and has to have his hair in a ponytail "it can't be high, it can't be low, it just has to be right".  T. 400.

## III.   PROCEDURAL HISTORY

On March 27, 2001, plaintiff filed an application on Victor's behalf for supplemental security income benefits alleging a disability onset date of March 1, 1996.  T. 50-52.  On October 11, 2001, the application was denied.  T. 21.  Plaintiff requested a hearing which was held before Administrative Law Judge ("ALJ") Terence Farrell on March 5, 2003.[7]  T. 374-403.  On April 7, 2003, the ALJ found that Victor was not under a disability.  T. 12-20.  On March 3, 2004, the Appeals Council concluded that there was no basis under the Regulations to grant plaintiff's request for review, rendering the ALJ's decision the final determination of the Commissioner.  T. 3-5.  After exhausting all her options for review through the Social Security Administration's tribunals, plaintiff filed this action.

## IV.   ADMINISTRATIVE LAW JUDGE'S DECISION

### A.   Standard of Review

Under 42 U.S.C. §§ 405(g) and 1383(c)(3), the Court does not employ a *de novo* review, but rather must determine whether substantial evidence supports the Commissioner's findings and

---

[7]  Defendant states that this matter did not undergo the reconsideration stage of the disability claims process because the matter was included as part of the Disability Redesign Prototype.  *See* Dkt No. 11 at p. 1, n.2 (citing T. 58).

that the correct legal standards have been applied.  *See Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *Urtz v. Callahan*, 965 F. Supp. 324, 325-26 (N.D.N.Y. 1997) (citing, *inter alia*, *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Substantial evidence is "more than a mere scintilla," it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Citations omitted. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

The ALJ must set forth the crucial factors supporting the decision with sufficient specificity.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  Where the ALJ's findings are supported by substantial evidence, the court may not interject its interpretation of the administrative record.  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); 42 U.S.C. § 405(g).  Where the weight of the evidence, however, does not meet the requirement for substantial evidence or a reasonable basis for doubt exists as to whether correct legal principles were applied, the ALJ's decision may not be affirmed.  *Johnson*, 817 F.2d at 986.

### B.    Determination of Childhood Disability

An individual under the age of eighteen is disabled, and thus eligible for SSI benefits, if he

> has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(I).  That definitional provision goes on to exclude from coverage any "individual under the age of 18 who engages in substantial gainful activity. . . ."  42 U.S.C. § 1382c(a)(3)(C)(ii).  By regulation, the agency has prescribed a three-step evaluative process to be employed in determining whether a child can meet the statutory definition of disability.  20 C.F.R. § 416.924; *Kittles v. Barnhart*, 245 F. Supp. 2d 479, 487-88 (E.D.N.Y. 2003); *Ramos v.*

*Barnhart*, 02 Civ. 3127, 2003 WL 21032012, at *7 (S.D.N.Y. May 6, 2003).  The first step of the test, which bears some similarity to the familiar, five-step analysis employed in adult disability cases, requires a determination of whether the child has engaged in substantial gainful activity. 20 C.F.R. § 416.924(b); *Kittles*, 245 F. Supp. 2d at 488.  If so, then both statutorily and by regulation the child is ineligible for SSI benefits.  42 U.S.C. § 1382c(a)(3)(c)(ii); 20 C.F.R. § 416.924(b).

If the child has not engaged in substantial gainful activity, then the second step requires examination of whether the child suffers from one or more medically determinable impairments that, either singly or in combination, are severe – that is, which causes more than a minimal functional limitation.  20 C.F.R. § 416.924(c); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7.  If the existence of a severe impairment is discerned, the agency must next determine whether it meets or equals a presumptively disabling condition identified in the listing of impairments set forth by regulation, 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "listings").  *Id.* Equivalence to a listing can be either medical or functional.  20 C.F.R. § 416.924(d); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7.  If an impairment is found to meet, or qualify as medically or functionally equivalent to, a listed disability, and the twelve month durational requirement is satisfied, the child will be deemed disabled.  20 C.F.R. § 416.924(d)(1); *Ramos*, 2003 WL 21032012, at *8.

Under the regulations, analysis of functionality is informed by consideration of how a claimant functions in six areas which are denominated as "domains," and described as "broad areas of functioning intended to capture all of what a child can or cannot do."  20 C.F.R. § 416.926a(b)(1); *Ramos*, 2003 WL 21032012, at *8. Those prescribed domains include:

(I) [a]cquiring and using information;

(ii) [a]ttending and completing tasks;
(iii) [i]nteracting and relating with others;
(iv) [m]oving about and manipulating objects;
(v) [c]aring for [oneself]; and
(vii) [h]ealth and physical well-being.

20 C.F.R. § 416.926a(b)(1).  A finding of disability is warranted if a "marked" limitation, defined

as when the impairment "interferes seriously with [the claimant's] ability to independently

initiate, sustain, or complete activities," 20 C.F.R. § 416.926a(e)(2)(I), is found in two of the

listed domains.  20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8.  Functional

equivalence also exists in the event of a finding of an "extreme" limitation, meaning "more than

marked," representing an impairment which "interferes very seriously with [the claimant's]

ability to independently initiate, sustain, or complete activities," 20 C.F.R. § 416.926a(e)(3)(I), in

one domain.  20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8.

## C.      The ALJ's Findings

Using the three-step disability evaluation, the ALJ found first that Victor has not engaged

in any substantial gainful activity since the alleged onset disability date of March 1, 1996; second,

that Victor has severe impairments consisting of Tourette's Syndrome, Borderline Intellectual

Functioning, Attention-Deficit/Hyperactivity Disorder, and speech and language delays; and

third, that none of Victor's severe impairments meet, medically equal, or functionally equal any

of the listed, presumptively disabling conditions set forth in Appendix 1 of the Regulations.  T.

15-20.  The ALJ evaluated Victor's functional abilities in the six domains established by 20

C.F.R. § 416.926a(b)(1) and found that Victor's limitations were "less than marked" with regard

to acquiring and using information, attending and completing tasks, interacting and relating to

others, caring for himself, and health and physical well being.  T. 18-19.   The ALJ found that

Victor had no limitation in his ability to move about and manipulate objects.  T. 19.

Consequently, the ALJ concluded that Victor was not disabled.  *Id.*

## V.      DISCUSSION

In seeking federal judicial review of the Commissioner's decision denying Victor benefits,

plaintiff contends that the ALJ erred by failing to find that Victor has a marked impairment in the

following four domains: (1) acquiring and using information; (2) attending and completing tasks;

(3) interacting and relating; and (4) caring for yourself.

### A.      New Evidence

Following the ALJ's decision, plaintiff submitted new evidence to the Appeals Council

for consideration.  T. 348-73.  This evidence included Dr. Burky's psychiatric evaluation, school

disciplinary records, and other academic records.  *Id.*  Although the Appeals Council denied

review of the ALJ's decision, it expressly considered the new evidence, some of which concerned

the time period after the ALJ's decision.  T. 3, 6.  Defendant argues that the Court should not

consider the evidence which post-dates the ALJ's April 7, 2003, decision, including Dr. Burky's

report, because it does not relate to the period at issue.[8]

Evidence submitted to the Appeals Council following the ALJ's decision becomes part of

the administrative record to be considered on judicial review.  *Perez v. Chater*, 77 F.3d 41, 45 (2d

Cir. 1996).  The "only limitations" in the regulations governing the Appeals Council's

consideration of new evidence "are that the evidence must be new and material and that it must

relate to the period on or before the ALJ's decision."  *Id.* (citing 20 C.F.R. §§ 404.970(b) and

416.1470(b)).  Thus, the new evidence is part of the administrative record for purposes of judicial

---

[8]  There is no indication that defendant objects to the Court's consideration of disciplinary records and academic reports dated prior to April 7, 2003, including CSE notes from a February 27, 2003 meeting, T. 352, and bus conduct reports dated December 3, 2002 through March 18, 2003, T. 360-62.

review.  *See id.* (holding that "new evidence submitted to the Appeals Council following the

ALJ's decision becomes part of the administrative record for judicial review when the Appeals

Council denies review of the ALJ's decision.")

Defendant argues that notwithstanding the above, the Court should disregard Dr. Burky's

report, which is based on a December 5, 2003, evaluation because it post-dates the ALJ's decision

and is, therefore, not material.  Although the regulations prohibit the Appeals Council from

considering new evidence that does not relate "to the period on or before the date of the

administrative law judge hearing decision", 20 C.F.R. §§ 404.970(b), 416.1470(b), the Second

Circuit has "observed, repeatedly, that evidence bearing upon an applicant's condition subsequent

to the date upon which the earning requirement was last met is pertinent evidence in that it may

disclose the severity and continuity of impairments existing before the earning requirement date

or may identify additional impairments which could reasonably be presumed to have been

present...."  *Lisa v. Secretary of Dep't of Health and Human Serv.*, 940 F.2d 40, 44 (2d Cir.1991)

(internal quotation marks omitted).

In this case there is a basis for concluding that Dr. Burky's report is "new" evidence

because Dr. Burky copiously recounted Victor's illness, psychiatric history, social and

developmental history, and medical history, T. 369-70, rendered his diagnoses based both on

Victor's history and present behavior, and questioned the validity of Victor's diagnosis of

Tourette's Syndrome.  T. 371-72.  Therefore, this evidence was "relevant to the claimant's

condition during the time period for which benefits were denied".  *Tirado v. Bowen*, 842 F.2d

595, 597 (2d Cir. 1988); *see also Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004) (finding the

evidence new even though it was generated after the ALJ's decision because it suggested "that,

during the relevant time period, David's condition was far more serious than previously thought

and that additional impairments existed when David was younger."). Accordingly, the Court finds that defendant's argument with regard to Dr. Burky's report is without merit.

However, the school disciplinary records and academic reports dated after April 7, 2003, including: the suspension and disciplinary notices dated September 10, 2003 through October 31, 2003, T. 354-59; the disciplinary infraction entries contained in T. 363-65, which occurred after April 7, 2003; the CSE meeting notes dated November 18, 2003, T.66-67; and Interim Report dated October 3, 2003, T. 368, reflect Victor's behavior and progress after the ALJ's decision and therefore are not material. *See* 20 C.F.R. §§ 404.970(b), 416.1470(b). Consequently, the Appeals Council properly concluded that this evidence provided no basis for changing the ALJ's decision. *See Perez v. Barnhart*, 234 F.Supp.2d 336, 342 (S.D.N.Y. 2002) (finding that the Appeals Council properly concluded that the additional evidence the plaintiff submitted following the ALJ's decision "did not provide a basis for changing the ALJ's decision" because it "concerned Plaintiff's treatment *after* the ALJ hearing.").

## B.    Domains

### 1.    Acquiring and Using Information

Plaintiff contends that the ALJ's finding that Victor has "a less than marked limitation" in the domain of acquiring and using information was not supported by substantial evidence. This domain addresses how well a child learns information, and uses the information he or she has learned. 20 C.F.R. § 416.926a(g). For children ages 6 to 12, the regulations provide:

> When you are old enough to go to elementary and middle school, you should be able to learn to read, write, and do math, and discuss history and science. You will need to use these skills in academic situations to demonstrate what you have learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. You will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making

change).  You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others.

20 C.F.R. § 416.926a(g)(2)(iv).

The ALJ found that Victor had "a less than marked limitation" in his ability to acquire and use information.  T. 17.  In so finding, the ALJ noted that Victor's IQ was in the range of borderline intellectual functioning, that Victor had a low aptitude for mathematics and that he attended special education classes.  *Id.*  The ALJ credited a report from a March 26, 2002 CSE meeting that Victor's progress in mathematics was satisfactory, that he could "tell time to the hour", had a "grasp" of coin values and paper money, was an "active oral reader", and had neat written work.  *Id.*  With regard to Victor's speech and language impairment, the ALJ noted that there was no current "speech and language evaluation" but that he has received speech services since 2001 to "address his language in vocabulary delays, as well as his language processing difficulties".  *Id.*  Finally, the ALJ noted Dr. Payne's observation that Victor's speech was "fluent and clear", that Victor had no "articulation difficulties", had good "overall intelligibility", and adequate "expressive and receptive language skills".  *Id.*

An ALJ has a legal duty to consider "all evidence" in the case record before making a determination as to whether a claimant is eligible for disability benefits.  20 C.F.R. § 416.920(a)(3); *see Sutherland v. Barnhart*, 322 F.Supp.2d 282, 289 (E.D.N.Y. 2004) ("It is not proper for the ALJ to simply pick and choose from the transcript only such evidence as supports his determination, without affording consideration to evidence supporting the plaintiff's claims. It is grounds for remand for the ALJ to ignore parts of the record that are probative of the plaintiff's disability claim."); *see also Lopez v. Secretary of Dep't of Health & Human Servs.*, 728 F.2d 148,

150-51 (2d Cir.1984) ("We have remanded cases when it appears that the ALJ has failed to consider relevant and probative evidence which is available to him.").   In this case, the ALJ did not mention the plethora of prior and subsequent reports which document some progress, but also show that Victor has had years of academic difficulties in acquiring and using information.  For instance, although the March 26, 2002 CSE meeting report shows, as the ALJ noted, Victor's progress, the ALJ did not acknowledge a subsequent report dated November 19, 2002 from Victor's fifth grade teacher which indicated that while Victor's effort was satisfactory in mathematics, the teacher assigned Victor 1's, on a scale of 1 (Below), 2 (Developing), 3 (Competent), and 4 (Exemplary), in five of the six areas evaluated because he was "not meeting the standard" and was instead "working on key concepts, processes and skills that are *below* grade level expectations."  T. 165-66.  Victor received 2's in the area of reading because he "occasionally" met the standard, was "beginning to grasp and apply the key concepts, processes and skills", but produced work "that contains many errors and is inconsistent in meeting grade level expectations".  T. 165.  Victor also received: 1's and 2's in writing (with the exception of a 3 for "writes neatly"), science, technology, and social studies; 2's and 3's in listening and speaking; and 3's and 4's in art and physical education.  *Id.*

Nor did the ALJ mention prior reports which suggested a marked limitation in the domain of acquiring and using information.  For example, according to CST meeting notes, Victor made "very slow progress" in first grade. T. 203.  The Section 504 plan from second grade indicated that Victor had "difficulty focusing, retaining information, weak foundation for mathematic skills."  T. 181.  Moreover, there is evidence from the psycho-educational evaluation Victor underwent in third grade that Victor ranked in the "Low Average Range" for reading, had difficulty in reading comprehension, and had made "minimal academic gains" in mathematics

since first grade.  T. 132.  Victor's third grade teacher stated that Victor was "[s]everely below grade level in all areas.  Retention of new information is virtually nonexistant.  This has been a consistent pattern since K."  T. 218.  Victor's teacher further stated that he functioned "on a very low level" and required "much repetition to understand something, but does not remember how to do it the next day."  T. 219.

Finally, while the ALJ cited the portion of Dr. Payne's report regarding Victor's speech abilities in support of his conclusion that the record did not contain evidence of a marked limitation in the domain of acquiring and using information, the ALJ made no reference to the aspect of Dr. Payne's report which stated that Victor "would have difficulties learning in accordance to cognitive functioning."  T. 141.  Thus, although, as the ALJ discussed, there was evidence of progress in fourth grade, in the absence of any attempt to reconcile conflicting evidence in the record, or to assess the complete academic picture, *see Matos ex rel. Mota v. Barnhart*, 05 Civ. 10539, 2007 WL 943654, *10 (S.D.N.Y. Mar. 27, 2007) (finding that although the ALJ looked to academic evidence to support the conclusion that the claimant had a less than marked limitation, the ALJ "neglected to adequately evaluate the complete academic picture"), the Court cannot say the ALJ's finding that Victor had a less than marked limitation in the area of acquiring and using information is supported by substantial evidence.

## 2.    Attending and Completing Tasks

Plaintiff contends that the ALJ's finding that Victor has "a less than marked impairment" in the domain of attending and completing tasks is not supported by substantial evidence.  This domain concerns how well a child is able to focus and maintain attention.  20 C.F.R. § 416.926a(h).  For children ages 6 to 12, the regulations provide:

> When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

20 C.F.R. § 416.926a(h)(2)(iv).

The ALJ found that Victor has "a less than marked impairment" in this domain. T. 17. While the ALJ noted that Victor benefitted from one-on-one attention both at school and home, the ALJ found that "his overall academic achievement is commensurate with his intellectual functioning, so it appears that his attention problems have not caused serious underachievement." T. 18. The ALJ also found that "overall the record suggests significant improvement". *Id*. The ALJ noted that on August 13, 2001, Dr. Theodore Talma, Victor's treating pediatrician, found that Victor's behavior was "improving" and he was "focusing better at his work." T. 17, 169. Moreover, the ALJ considered Dr. Talma's observation that Victor was "not hyper in [the] office." T. 18. The ALJ also noted the respective opinions of Drs. Payne and Salamone that Victor's attention and concentration were "impaired" and decreased (indicated by a downward arrow). *Id*. While acknowledging the school records showing Victor's problems with concentration and attention, the ALJ pointed out that Feiden, the speech and language pathologist, stated that Victor "was a pleasant child who needed few reminders to stay on task". *Id*. The ALJ also relied on testimony from the hearing that Victor, while not "totally compliant" does many of his chores at home with reminders, and cited the daily reports from the 2002-2003 school year indicating that he shows good effort, usually completes his classwork, and is "neat at his work."

*Id.* Based on this evidence, the ALJ concluded that Victor had "significantly improved in this area" since the April 2001 indication from his teacher that Victor "was completing only 1/10 of a given assignment in the time it took other students to complete the assignments". *Id.*

Plaintiff argues that the record is replete with references to the difficulties Victor has in the area of attending and completing tasks. Plaintiff asserts that both Dr. Burky's diagnosis of ADHD and Dr. Payne's opinion support a finding that Victor has a marked limitation in this domain.

Dr. Burky's diagnosis of ADHD and the contents of his report are probative of this issue and cast doubt both on the ALJ's finding that Victor's attention and concentration have improved significantly since April 2001 and the ALJ's conclusion that Victor is less than markedly impaired in this domain. Dr. Burky listed inattentiveness, poor focusing and concentration, disorganization, trouble sitting still and exceptional impulsivity as some of Victor's symptoms. T. 369. After conducting a mental status examination, Dr. Burky opined that Victor's "concentration and on [sic] are both fair to poor. Victor requires questions to be repeated to him several times." T. 371.

Furthermore, there was ample evidence in the record that prior to April 2001, Victor regularly had difficulty focusing and maintaining attention. For instance, in first grade, Victor required "1:1 monitoring due to attention and skills, easily distracted". T. 203. In second grade, school faculty noted that Victor had "difficulty focusing". T. 181. There is evidence that in third grade, Victor required help to complete most tasks, was easily disrupted by other students, and sat at a desk that "had been moved away from other students to help him focus." T. 192. In fourth grade, Victor's teacher wrote that "Victor is easily distracted, especially during math. He is also a doodler and he has to be closely monitored to make sure he stays on the task I want him working

34

on." T. 161.  Moreover, Dr. Payne opined that Victor's "attention and concentration were impaired" and indicated that Victor "needs frequent reminders and supervision" with regard to his own self-care.  T. 140.  Thus, the Court concludes that this evidence, analyzed together with Dr. Burky's report, calls into question whether there is substantial evidence to support the ALJ's conclusion that Victor's ability to attend and complete tasks had improved, and consequently, whether he had a less than marked impairment in this domain.

### 3.    Interacting and Relating to Others

Plaintiff contends that the ALJ's finding that Victor has "a less than marked impairment" in the domain of interacting and relating to others is not supported by substantial evidence.  This domain concerns how well the child initiates and sustains emotional connections with others, develops and uses the language of his community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others.  20 C.F.R. § 416.926a(I).  For children ages 6 to 12, the regulations further provide:

> When you enter school, you should be able to develop more lasting friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

20 C.F.R. § 416.926a(i)(2)(iv).

The ALJ found that Victor had less than a marked impairment in this domain.  T. 18.  The ALJ discussed Victor's receipt of a series of bus conduct misconduct reports, disciplinary notices and referrals, and suspensions beginning in 2000 and continuing through 2001, but noted that during the 2002-2003 academic year, although Victor had incidents on the bus, he had no school suspensions.  T. 18.  The ALJ cited the daily progress reports and stated that, more often than not,

Victor had done fairly well, though the ALJ noted that there were "some occasional problems" getting along with peers.  *Id*.  The ALJ also relied on Victor's teacher's statement that he has developed into a leader in his peer group and has well when asked to help with academics or "playing in periods of free time."  *Id*.  The ALJ noted Victor's problems getting along "in the family" and that he had "limited peer relationships in the home setting."  T. 18-19.

Plaintiff principally relies on Victor's "GAF assessment in the range of 41-50" as evidence of his marked impairment in the "interacting and relating domain".  Dr. Burky rated Victor with a global assessment of functioning ("GAF") of 45.[9]  While this score lends support to plaintiff's argument, there is also evidence in the record demonstrating that Victor has a less than marked impairment in the interacting and relating domain.  For example, on April 26, 2001, Victor's third grade teacher noted that Victor's behavior had improved since receiving special services.  T. 126-27.  She also commented, "[s]ince he has started to get educational support, Victor's behavior has been fine . . . ."  T. 127.  When asked to describe Victor's developmental age in relation to chronological age, how well his speech can be heard, and how well his speech can be understood especially by strangers, Victor's teacher described his abilities as average.  *Id.* at p. 129.

Similarly, the June 2001 IEP reflects that Victor "met with some academic success and has made observable progress in the small group situation (group of 5) . . . . His motivation to be correct in the group is obvious and he tries very hard to complete all tasks."  T. 192.  It was also noted that Victor "has shown progress in his abilities to cooperate in a diverse group . . . . He has

---

[9]  The Global Assessment of Functioning (GAF) Scale (DSM-IV Axis Victor) ranks psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Diagnostic and Statistical Manual of Mental Disorders, 4th Ed. (American Psychiatric Ass'n 1994) ("DSM") at 32. A GAF range of 41-50 indicates that the individual has a "serious impairment in one of the following: social, occupational, or school functioning."

become more helpful to others and is able to join in without intense competition than he was when he first joined the group in early April.  He is well liked by other students." *Id.*

On August 13, 2001, Dr. Frank Salamone, a psychologist, indicated that he had seen Victor on a monthly basis since February of 2001.  T. 142-47.  Dr. Salamone described Victor as "cooperative, well groomed, and behaved in [an] office setting."  T. 145.  Dr. Salamone found no evidence of abnormalities in Victor's speech, thought, and perception, and Victor's mood and affect were within normal limits.  *Id.*

Moreover, as the ALJ noted, in the March 2002 IEP, Victor's teacher described Victor as "very comfortable in my classroom . . . Victor is a happy student most of the time in my room. He is much bigger than the other students and has developed into a leader in his peer group. Thankfully, he is not an aggressive boy as his size would give him a distinct advantage in a physical argument.  He has responded well when asked to help out a peer with academics or playing in periods of free time."  T. 161.  It was also noted that Victor "asks for help when he is confused and is getting much better at following directions in all academic subjects. . . . All in all, he is a great kid."  T. 161-62.

Further, as the ALJ noted, Harold Sperazza, a social worker, found on February 24, 2003 that Victor's adjustment to the special education classroom "has been very good" and that "[b]ehaviorally, he has made good progress in all areas."  T. 272.  He also found, "Victor quickly engaged with his counselor and he showed a much improved ability and willingness to express his frustrations and needs to adults rather than acting out behaviorally.  His peer relationships were very positive throughout [the] year and conflicts with peers were minimal."  *Id.*

In light of the foregoing, although Victor certainly has difficulties in this domain, the Court finds that the ALJ's determination that Victor suffered from a less than marked impairment

in the domain of interacting and relating with others is supported by substantial evidence.

### 4.    Caring for Yourself

Plaintiff argues that the ALJ's finding that Victor has "a less than marked impairment" in the domain of "caring for yourself" is not supported by substantial evidence.  In this domain, how well a child maintains a healthy emotional and physical state, including how well he has his physical and emotional needs met in appropriate ways, how he copes with stress and changes in his environment, and whether he cares for his own health, possessions and living area are relevant.  20 C.F.R. § 416.926a(k).  For children ages 6 to 12, the regulations further provide:

> You should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely. You should begin to recognize that you are competent in doing some activities and that you have difficulty with others. You should be able to identify those circumstances when you feel good about yourself and when you feel bad. You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. You should begin to demonstrate consistent control over your behavior, and you should be able to avoid behaviors that are unsafe or otherwise not good for you. You should begin to imitate more of the behavior of adults you know.

20 C.F.R. § 416.926a(k)(2)(iv).

The ALJ found that Victor has less than a marked impairment in this domain.  T. 19.  The ALJ explained: "There is some evidence of impulsivity and not paying close attention to self-care.  The claimant needs reminders to do personal care and assigned chores.  His teacher reports that his main problem is his impulsive behavior, which is the source of reprimands."  T. 19.

Plaintiff argues that there is substantial evidence in the record showing that Victor "engages in reckless, risk-taking behavior that has resulted in significant injury" and therefore asserts that Victor has a marked impairment in the "caring for yourself domain".  One of the relevant areas of inquiry in the "caring for yourself" domain is whether the claimant is "able to

avoid behaviors that are unsafe or otherwise not good for you". 20 C.F.R. § 416.926a(k)(2)(iv).

In this case, Dr. Burky's report recounts Victor's past medical history as follows:

> He has a history of multiple fractures and broken bones due to jumping off things. Some of these have resulted in the need for stitches. He has one history of loss of consciousness from running into a tree. His mother suspects that he may have had a mild concussion. He also needed stitches in his head for this. He has a history of needing a neck brace because of having a fractured collarbone, again because of jumping off of something. He jumps off roofs, out of trees, and does risky and dangerous "tricks" with his bicycle.

T. 379. Although the ALJ had no opportunity to consider Dr. Burky's report, there was evidence in the record suggesting that Victor engaged in "risky" behavior which resulted in physical injury to himself, *see e.g.* T. 135 (psycho-educational evaluation from 2000-2001 school year "Victor presents with significant aggressive and risk-taking behaviors which resulted in significant injury"); T. 179 (November 15, 2000 CST meeting notes indicating that Victor has had "stitches 3x in last year" and that he "likes jumps on his BMX"). In the absence of any discussion of this evidence, the Court cannot say the ALJ's finding is supported by substantial evidence. Thus, on remand, the ALJ should consider whether evidence showing that Victor engaged in risky behavior resulting in harm to himself demonstrates a marked impairment in the domain of caring for yourself.

## VI. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED**, that the Commissioner's decision denying disability benefits is **reversed for further proceedings consistent with the decision herein and for consideration of Dr. Burky's report**; and it is further

**ORDERED** that the Commissioner's motion for judgment on the pleadings (Dkt. No.11) is **denied**; and it is further

**ORDERED** that this matter is **remanded** to the Commissioner for further proceedings consistent with the above; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been rescinded, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit.

**IT IS SO ORDERED.**

Dated: September 30, 2008
      Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge